In re FARMLAND INDUSTRIES,
INC., et al., Debtor.

No. 02–50557–JWV.

United States Bankruptcy Court,
W.D. Missouri.

April 17, 2003.

Cassandra L. Writz, Cynthia Dillard Parres, Laurence M. Frazen, Mark G. Stingley, Robert M. Thompson, Tammee E. McVey, Bryan Cave LLP, Gene A. DeLeve, Berman, DeLeve, Kuchan & Chapman, Michael D. Hockley, Spencer, Fane, Britt & Browne, Kansas City, MO, Frank W. Lipsman, Morton Hubbard Ruzicka & Kreamer, Olathe, KS, for debtor.

Jerry L. Phillips, Paula C. Acconcia, Office of the U.S. Trustee, Bruce E. Strauss, Thomas N. Lane, Merrick, Baker, Strauss,

Thomas N. Franklin, Erlene W. Krigel, Krigel & Krigel, P.C., Kansas City, MO, Robert S. Blanc, Houston, TX, Thomas J. O'Neal, Shughart, Thomson & Kilroy, Springfield, MO, Cynthia F. Grimes, Lenexa, KS, for interested parties.

Christopher A. Artzer, Akin, Gump, Strauss, Hauer & Feld, Henry J. Kaim, S. Margie Venus, Houston, TX, Christopher J. Redmond, Gary D. Barnes, Marcus Alan Helt, Husch & Eppenberger, Kansas City, MO, Daniel J. Flanigan, James E. Bird, Polsinelli, Shalton & Welte, P.C., Kathleen R. Pasulka-Brown, Mark L. Prager, Michael· J. Small, William J. McKenna, Foley & Lardner, Chicago, IL, for Official Committee of Unsecured Creditors.

### MEMORANDUM OPINION AND ORDER

JERRY W. VENTERS, Bankruptcy Judge.

The matter now before the Court is the Motion of the Debtors, Farmland Industries, Inc., et al., for approval of an amendment to the Debtors' DIP Credit Agreement with a consortium of lenders. The Motion was vigorously supported by Deutsche Bank Trust Company Americas ("Deutsche Bank"), the agent for the lenders, and was just as vigorously opposed by the Official Committee of Unsecured Creditors ("Creditors Committee") and the Official Committee of Bondholders ("Bondholders Committee").

After two days of hearings that ran well into the evening hours, concluding on February 25, 2003, the Court took the matter under advisement. Because of the urgency of the issues involved and the potential cost to the Debtors of further delay, the Court on March 3, 2003, entered an Interim Order approving the Debtors' Motion and the amendment to the DIP Credit Agreement, and stated that the Court

would issue an extended opinion at a later date setting out the Court's findings of fact and conclusions of law. This is that extended opinion.[1]

## PROCEDURAL BACKGROUND

The Debtors[2] filed voluntary petitions under Chapter 11 of the Bankruptcy Code[3] in this Court on May 31, 2002. On July 2, 2002, the Court entered a Final Order (i) Authorizing Post Petition Financing and (ii) Granting Super Administrative Priority Expense Claim Status (the "DIP Financing Order"), which, *inter alia,* authorized the Debtors to obtain post-petition financing of up to $25 million under a Tranche A revolving credit facility and up to $281 million under a Tranche B revolving credit facility. The DIP Financing Order approved the Debtors' entry into a First Amended and Restated Debtor–in–Possession Credit Agreement and Adequate Protection Stipulation dated June 5, 2002, together with any amendments (the "DIP Credit Agreement") under which Farmland Industries, Inc., and Farmland Foods, Inc., were the borrowers and the other Debtors were guarantors, and the various financial institutions identified on the signature pages were the lenders (the "DIP Lenders"). As noted, Deutsche Bank was the administrative agent ("Agent") for the DIP Lenders, and it has taken a very active role in this case from the beginning.

On January 14, 2003, the Debtors filed the instant Motion (the "Motion;" Document # 2000) seeking the approval of a First Amendment ("First Amendment") to the DIP Credit Agreement. Simultaneously with the filing of this Motion, the Debtors filed a second motion to permit the filing of the First Amendment itself under seal, pursuant to 11 U.S.C. § 107(b), on the basis that such protection was necessary to prevent the disclosure of sensitive and proprietary information, particularly the disclosure of certain timelines relating to the marketing and sale of certain of the Debtors' assets. On February 14, 2003, the Court entered an Order authorizing the filing of the First Amendment under seal (Document # 2540).

Deutsche Bank subsequently filed a Memorandum (Document # 2643) in support of the Debtors' Motion, and the Bondholders Committee (Document # 2205) and the Creditors Committee (Document # 2206) filed Objections.[4]

Prior to the hearing, the Debtors moved, pursuant to 11 U.S.C. § 107(b), to close all or part of the hearing to the public on grounds that such closure was necessary to prevent the disclosure of sensitive proprietary or commercial information regarding (a) the required marketing and sale of assets and (b) the Debtors' liquidity. That request was opposed by Debt Acquisition Company of America VI,

---

1. This Court has jurisdiction of the pending matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (D). This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 7052, Fed.R.Bankr.P., made applicable to this contested motion by Rule 9014, Fed.R.Bankr.P.

2. There are five Debtors in these jointly administered Chapter 11 proceedings: Farmland Industries, Inc., Farmland Foods, Inc.,

SFA, Inc., Farmland Pipe Line, Inc., and Farmland Transportation, Inc.

3. Title 11, United States Code.

4. The Bondholders Committee and the Creditors Committee will be referred to collectively herein at times as "the Committees." For the most part, their positions in opposition to the Motion were identical, and they cooperated in and coordinated their presentation of evidence at the hearing, which the Court greatly appreciated.

L.L.C. ("DACA"), an entity that has purchased a small amount of claims (approximately $15,000) so as to be a creditor in these proceedings. More importantly, DACA is an acknowledged wholly owned subsidiary of Smithfield Foods, Inc., a competitor of the Debtors in the foods business that has made publicized but unsuccessful efforts to purchase some of the Debtors' assets. The Court granted the Debtors' Motion to close the hearing with respect to issues of the marketing and sale of assets and the Debtors' liquidity in an Order entered on February 14, 2003 (Document # 2540). Unfortunately, in this instance the exception swallowed the rule, because the parties insisted that virtually all of the testimony to be adduced at the hearing revolved around the protected issues. Consequently, virtually the entire hearing was closed to the public, and more particularly to DACA and its attorneys.[5]

The Court conducted a hearing on the Motion and all Objections on February 20, 2003, and February 25, 2003, at the United States Courthouse in Kansas City, Missouri. As previously indicated, the hearing ran late into the evening on both days, and the Court heard approximately 18 hours of evidence and argument on the Motion and the Objections. Because much of the hearing was closed and much of the testimony concerned the timelines for the marketing and sale of assets and the Debtors' liquidity, as affected by the First Amendment, the Court's discussion of some of the issues may necessarily be somewhat restricted.

## FACTUAL FINDINGS AND BACKGROUND

Farmland Industries, Inc., is reportedly the largest farmer-owned cooperative in the United States. It and the other Debtors, as well as other non-Debtor entities, are engaged in a variety of farm-related businesses. Primarily, the Debtors' businesses are (or have been) the manufacture and distribution of fertilizers and the production of beef and pork for the retail market. The Debtors' fertilizer assets ("Fertilizer Assets") consist of domestic nitrogen fertilizer production and distribution facilities throughout the Midwest and a joint venture interest in an ammonia nitrogen production facility in Trinidad.[6] The Debtors' interests in beef production ("Beef Assets") consist primarily of partnership interests in Farmland National Beef. Their interests in pork production ("Pork Assets") consist of hog production facilities, pork processing plants, and marketing facilities.[7] In addition to these core assets, the Debtors owned at the time of filing numerous non-core assets, such as a petroleum refinery and facilities, warehouse facilities, transportation brokerage, and wholesale and retail farm supply stores; some of these non-core assets have been sold in the course of these Chapter 11 proceedings.

The starting point for an understanding of the pending issues is the DIP Credit Agreement, entered into by the Debtors and the DIP Lenders on June 5, 2002, and

---

**5.** Oddly enough, DACA did not file an objection to the Debtors' Motion seeking approval of the First Amendment to the DIP Credit Agreement. Had it done so, excluding DACA from the hearing would have been much more problematical.

**6.** The sale of a majority of the Fertilizer Assets has now been approved by the Court, as will be discussed *infra*.

**7.** The Beef Assets and the Pork Assets are often referred to together by the parties as the "Protein Assets." The Court will, likewise, use that term to apply to those assets collectively.

finally approved by the Court on July 2, 2002. As noted earlier, under the DIP Credit Agreement the Debtors had available a Tranche A revolving facility with a maximum of $25 million and a Tranche B revolving facility with a maximum availability of $281 million. Of relevance to the instant matter, the DIP Credit Agreement provided that the DIP Lenders' commitment to provide DIP financing for the Debtors would terminate eighteen months after the Petition Date (i.e., November 30, 2003), unless a specified event caused an earlier termination. In Section 1.1, Definitions, the DIP Credit Agreement (Committees' Ex. 12) provided:

> **"Commitment Termination Date"** means the earliest of (i) the date that is eighteen (18) months after the Petition Date,...(v) the date of filing with the Court of any plan of reorganization or modification to any previously filed plan of reorganization, in any case which has not been approved in writing by all DIP Lenders prior to such filing, unless such plan provides for the payment (or cash collateralization in the case of Contingent Obligations) of all DIP Obligations and Prepetition Obligations in full in cash on the effective date thereof, (vi) the date of termination in whole of the Commitments pursuant to Section 8...

A similar provision was contained in Section 8.6 of the DIP Credit Agreement, which described an "Event of Default" as:

**Section 8. EVENTS OF DEFAULT**

> Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application of motion to, or order from the Court, the occurrence of any one or more of the following events, regardless of the reason therefore (sic), shall constitute an "Event of Default" hereunder:
>
> **8.6 *Bankruptcy Proceeding Events***

> (f) Without the prior written consent of all DIP Lenders, filing a plan of reorganization for any Borrower or Borrowers or any modification thereto, unless such plan provides for the payment (or cash collateralization in the case of Contingent Obligations) of all DIP Obligations and Prepetition Obligations in full in cash on the effective date thereof;

Most critical to the issue now before the Court, and the focal point of the parties' dispute, is Section 8.13, which further defined the parties' agreement with respect to the filing of a plan of reorganization:

> **8.13 *Plan of Reorganization.*** Failure of the Borrowers to file a plan of reorganization approved by all DIP Lenders (such approval not to be unreasonably withheld) by the date that is 180 days after the Petition Date (it being agreed, however, that it shall be reasonable for DIP Lenders to withhold approval of any plan that does not provide for the payment (or cash collateralization in the case of Contingent Obligations) of all DIP Obligations and Prepetition Obligations in full in cash on the effective date thereof).

Thus, the filing of a plan of reorganization that met with the approval of all of the DIP Lenders was a critical component of the Debtors' DIP financing. The deadline date for filing a plan of reorganization under the DIP Credit Agreement was November 27, 2002 (180 days after the May 31, 2002, Petition Date). As that deadline approached, the Debtors proposed one or more reorganization plans to the DIP Lenders, but the DIP Lenders declined to approve those proposals. Eventually, the Debtors filed a "bare bones" plan of reorganization on November 27, 2002, that did not have the approval of the DIP Lenders. Rather intense discussions took place between the Debtors and Deutsche Bank, the DIP Lenders' agent, in an attempt to

reach an agreement for waiver of the deadline. Those discussions failed, and on December 9, 2002, the DIP Lenders, through counsel for Deutsche Bank, notified the Debtors that they were in default of the DIP Credit Agreement. One of the default remedies reserved to the DIP Lenders was the right to cease funding under the DIP Credit Agreement. After numerous discussions, the Debtors and the DIP Lenders on January 8, 2003, entered into the First Amendment to the DIP Credit Agreement.

The salient features of the First Amendment were the following:

(1) The Tranche A facility of $25 million would be terminated as of December 9, 2002, and any outstanding letters of credit under the Tranche A facility would be deemed to be outstanding letters of credit under the Tranche B facility.

(2) The Debtors would be required to make principal reduction payments on the Tranche B credit facility of $40 million by February 28, 2003, and $10 million by March 31, 2003.

(3) Any prepayment of loans would result in a dollar-for-dollar reduction in the Tranche B facility.

(4) The DIP Lenders' agent, Deutsche Bank, would be given discretion to establish a reserve of $30 million against the Debtors' borrowing base at any time after February 28, 2003, thereby effectively reducing the Debtors' borrowing capacity by an additional $30 million.

(5) The Debtors would pay interest at the default rate provided in the DIP Credit Agreement from December 9, 2002, until the approval of the First Amendment by the Court.

(6) The DIP Lenders would waive the default that they had declared on December 9, 2002, for the Debtors' failure to file an approved plan of reorganization within 180 days of the Petition Date.

(7) The DIP Lenders would consent to any motion by the Debtors seeking an order extending the time in which to file a disclosure statement to March 31, 2003.

(8) On the effective date of the First Amendment, the Debtors would voluntarily reduce the Tranche B facility by $20 million, to a balance of $256,520,237.13.

(9) A non-refundable amendment fee in the amount of $691,300 would be paid to Deutsche Bank, the agent for the DIP Lenders.

The First Amendment also included schedules or timelines for the Debtors to market and sell the Fertilizer Assets and the Protein Assets. Those schedules and timelines have been placed under seal and will be referred to only in general terms herein.[8]

## A. The issues presented.

The parties have raised essentially three basic issues with respect to the approval or disapproval of the First Amendment. The first is whether the Debtors exercised sound and reasonable business judgment in entering into the First Amendment. The second is whether the First Amendment is in the best interests of the estate and its creditors. And the third is whether the DIP Lenders unreasonably withheld their approval of the Debtors' proposed plan of reorganization (filed on November 27, 2002) and whether their declaration of a default in the DIP Credit Agreement was essentially a pretext to coerce the Debtors into agreeing to new and different

8. The attorneys could not agree on whether to call the schedules for the marketing and sale of assets "timelines," "deadlines," or "milestones." The Court believes that it makes no real difference what they are called, and will use the terms interchangeably.

financing terms more favorable to the DIP Lenders.

In an attempt to bring some semblance of order to the evidence presented, the Court will separately set out the evidence relating to these issues, recognizing that some overlapping may be necessary.

## B. Did the Debtors exercise sound and reasonable business judgment in entering into the First Amendment?

### 1. The Debtors' and the DIP Lenders' evidence

The Debtors' and the DIP Lenders' evidence in support of the First Amendment was presented through the affidavits and testimony of three of the principal officers of Farmland Industries: Robert B. Terry ("Terry"), the chief executive officer; Steven B. Rhodes ("Rhodes"), executive vice president and chief financial officer; and J. Randall Vance ("Vance"), vice president and treasurer. Their testimony reflects an extensive recent history of discussions and negotiations with Deutsche Bank, as agent for the DIP Lenders, in connection with the DIP Credit Agreement, the purported default for failing to file timely a plan of reorganization satisfactory to the DIP Lenders, and the First Amendment.

Terry was in almost constant consultation with Rhodes, Vance, and other members of the Debtors' senior management team with respect to the financing issues and the potential sale of assets. The Debtors recognized from the outset of the bankruptcy that one of the default remedies the DIP Lenders might choose to exercise was the cessation of funding under the DIP Credit Agreement. Accordingly, Terry had discussed with senior management the impact a threatened default declaration would have on the Debtors' businesses and liquidity. In analyzing the Debtors' financing, the Debtors established budgets and began doing longer-range financial forecasting, including the use of "rolling" 13–week cash flow projections. Rhodes and Vance analyzed, among other things, the companies' sources of cash to determine if they could comply with the requirements of the First Amendment, and all of the officers concluded that the Debtors could meet the requirements of the First Amendment and continue with the operation of their businesses. Terry testified that, in comparing projected income to the financing requirements, the Debtors found that they had "a positive cushion."

With respect to the milestones for the sale of assets, Terry had recognized as early as May or June 2002 that the Debtors would likely have to sell at least one of their core assets in order to satisfy their bank debt. In April 2002, when Terry was Farmland's general counsel and before he became the CEO, Farmland's Board of Directors adopted a "sense of the board" resolution in which it agreed that the company should sell whatever assets had to be sold to pay off the bank debt, which at that time stood at approximately $500 million. No assets were to be excluded from possible consideration for sale. When Terry became CEO in May, he determined that Farmland should engage in a strategic planning process concerning the sale of its assets before deciding which assets should be sold. The result of this planning process was that the Debtors determined that they would first sell non-core assets to pay down debt, then the Fertilizer Assets would be sold, and finally a part or all of the Beef Assets would be sold to the extent necessary to complete the payment of the bank debt. The plan was to then restructure the companies around the Pork Assets (or the "food business," as Terry called it).

Terry's testimony in the rebuttal phase of the hearing was slightly inconsistent

with his direct testimony, but not substantially so. Terry disagreed with suggestions that he had told Deutsche Bank's loan officer that the Debtors were going to be selling $500 million of assets, plus the Pork Assets, to pay down debt. However, he acknowledged that he had told the Lenders in May that the Debtors were going to develop a strategic plan for the sale of assets. According to Terry, the Debtors intended to "plan first and execute later." Terry also acknowledged that the Farmland Board of Directors had given management a general directive for the sale of $500 million in assets, and that the Lenders were aware of that Board resolution. Terry knew the company needed a plan and would have to take action for the sale of assets.

The entire senior management team was involved in the discussions concerning the sale of assets. Also, management consulted with the Debtors' investment banker, UBS Warburg, and its "finance people." The Debtors retained a broker post-petition to advise and assist in the marketing and sale of the Protein Assets. Extensive discussions were had with the DIP Lenders. In late August 2002, the Board of Directors met and approved the strategic plan for the marketing and sale of assets. Terry noted that the Debtors determined that they could not build a restructuring plan around the fertilizer business because of its volatility, particularly in recent years. However, the decision to sell the Fertilizer Assets was not easily reached, because 95% of Farmland is owned by local cooperatives and those cooperatives have been primarily involved in the sale of fertilizer over the years to their farmer-owners.

In early September 2002, the Debtors and the DIP Lenders began discussions regarding a waiver of the November 27, 2002, deadline for the filing of a plan of reorganization. However, no agreement was reached to waive the deadline. Drafts of a proposed plan of reorganization were circulated to the DIP Lenders, but were not acceptable to the banks. In an attempt to not be in default for failure to file a plan, the Debtors on November 27, 2002, filed a plan of reorganization that did not have the approval of the DIP Lenders. The Debtors did not file a disclosure statement with the plan; instead, they sought and were granted an extension of time, until January 15, 2003, to file their disclosure statement. That deadline has since been extended to March 31, 2003.

A dispute existed between the Debtors and the DIP Lenders over whether the Plan filed on November 27 satisfied the requirements of the DIP Credit Agreement and whether the DIP Lenders could reasonably disapprove the Plan, inasmuch as the Plan provided for payment of the DIP loans in full on the effective date of the Plan, which would occur prior to the maturity of the DIP loans. On that same date, November 27, the DIP Lenders gave the Debtors a temporary waiver of compliance with Section 8.13 of the DIP Credit Agreement. This temporary waiver was given to allow the DIP Lenders time to review and consider any plan of reorganization and to determine a course of action should the DIP Lenders determine that an event of default had occurred. After various internal discussions, the Debtors' senior management decided to take a "cooling off" approach to the alleged default and to attempt to negotiate a short-term amendment that would overcome the dispute over the adequacy of the filed Plan. Numerous discussions and considerable correspondence followed. The DIP Lenders first extended the temporary waiver of compliance with Section 8.13 to December 4, then to December 5, and finally to December 6, 2002. However, no agreement could be reached, and on December 9,

2002, the DIP Lenders advised the Debtors that they were in default of the requirements of the DIP Credit Agreement (Debtors' Ex. 2).

Considering the devastating impact that a cessation of funding by the DIP Lenders would have on the Debtors' business, Terry believed he had two choices: (1) The Debtors could challenge the DIP Lenders' refusal to approve the filed Plan and whether the Debtors were in default of the DIP Credit Agreement, or (2) the Debtors could attempt to negotiate a waiver of those requirements with the DIP Lenders, even if that meant accepting terms and conditions that the Debtors did not like.

After consultation with the senior management team, Terry concluded that the Debtors could not afford to engage in a public fight with the DIP Lenders over whether a default had or had not occurred in the DIP Credit Agreement. Terry believed that any legal challenge to the actions taken by the DIP Lenders would receive extensive media coverage and would focus widespread attention on the potential liquidity risk facing the Debtors if the DIP Lenders ceased funding the Debtors' business operations. Terry concluded that adverse publicity could negatively impact and possibly derail negotiations for the sale of the Fertilizer Assets, and could have a "dramatic and nearly catastrophic impact" on the retail business of Farmland Foods, which counted for much of its business on such large retailers as Wal–Mart, Costco, and Subway.

Terry testified that he was advised that the Debtors had perhaps a 20% chance of losing any litigation concerning the default declaration by the DIP Lenders. Nevertheless, Terry believed that a public fight with the DIP Lenders would have the same damaging effect on the retail foods business regardless of the outcome. At the same time, the Debtors were also concerned that the DIP Lenders' declaration of default would have to be disclosed in a 10–Q filing with the Securities and Exchange Commission ("SEC") in mid-January, 2003. Rhodes and other members of the senior executive committee believed that such public disclosure of the alleged default "would have catastrophic consequences to the business." With these considerations in mind, Terry directed the management team to renew its attempts to negotiate an agreement with the DIP Lenders. After extensive negotiations, the Debtors and the DIP Lenders arrived at an agreement on the First Amendment on January 8, 2003. The Debtors believed these negotiations resulted in much better terms in the First Amendment than the terms originally proposed by the DIP Lenders.

Terry testified that throughout this period he relied on the Debtors' "financial executive team" and the Debtors' managers, who had years of experience in the Debtors' businesses. He stated that he was more comfortable with the senior managers than he was with outside experts.

According to Rhodes, the changes in the DIP Credit Agreement will not adversely affect the Debtors' ability to effectively run their business operations, and will provide the Debtors with additional time to formulate a comprehensive Disclosure Statement that will take into account the effect of the sale of the Fertilizer Assets and other factors. Most importantly in Rhodes's view, the First Amendment enables the Debtors to avoid a potentially damaging fight with the DIP Lenders, a fight which would, at the least, detract from the Debtors' immediate efforts to liquidate assets.

#### 2. The Committees' evidence

The Committees did not adduce evidence to challenge the fact that the Debt-

ors' senior management had conferred at length and negotiated extensively with Deutsche Bank and the DIP Lenders concerning the alleged default in the DIP Credit Agreement and in arriving at a meeting of the minds on the First Amendment. However, the Committees vigorously contend that the Debtors did not exercise sound business judgment in entering into the First Amendment, primarily on the basis that the First Amendment is not in the best interests of the Debtors and their creditors (which the Court addresses in the following section).

Phillip F. Van Winkle, the Bondholders Committee's expert witness, while admitting that the Debtors' management was competent and honest, contended that management's projections and forecasts were often inaccurate and unreliable.[9] He testified that management's projections went out only until May 2003, and that they should have been extended out to November 30, 2003, the maturity date for the DIP Credit Agreement. Van Winkle was also critical of management for not taking into account adequately the Debtors' peak need for funding in the spring and early summer, when the fertilizer business places the most demands on the Debtors' liquidity. In Van Winkle's view, the reduced liquidity allowed under the First Amendment and the schedules for the marketing and sale of assets are too restrictive and stringent and could destroy the value of assets. He believes the First Amendment will increase the Debtors' risk of default. In summary, Van Winkle testified that he would have made a different decision.

Similarly, Matthew R. Niemann, the Creditors Committee's expert witness, was critical of the Debtors' management for

entering into the First Amendment.[10] In Niemann's opinion, the Debtors should have challenged the DIP Lenders' declaration of a default by seeking an immediate, summary determination of that issue in this Court when the default was declared on December 9. Niemann believed that it was very unlikely that the DIP Lenders would terminate the Debtors' financing, although he acknowledged that a termination of financing would have a "catastrophic effect" on the Debtors' businesses. Niemann stated that he had no reason to believe that the Debtors' officers had tried to get the best deal they could possibly get, although he later conceded that "they did the best they could under the circumstances."

### C. Is the First Amendment in the best interests of the estate and its creditors?

#### 1. The Debtors' and the DIP Lenders' evidence

The Debtors' senior executives—Terry, Rhodes, and Vance—all testified that they believed it was the best business judgment of the Debtors' management to enter into the First Amendment. They based their beliefs on several factors, all of which the Court considers of significance.

First, the senior executives believed that a public fight with the DIP Lenders over whether the Debtors were in default under the DIP Credit Agreement could have a devastating and perhaps catastrophic impact on the Debtors' business, particularly the retail foods business, regardless of the outcome of any legal challenge. According to Terry, the loss of one of Farmland Foods' major customers—such as Wal-

---

**9.** Van Winkle's testimony will be discussed in greater detail in the following section.

**10.** As with Van Winkle, Niemann's testimony will be set out in greater detail in the following section.

Mart, Costco, or Subway—or a panic among Farmland's hog suppliers "could have crippled our business." Even if the Debtors prevailed in a fight against the DIP Lenders, Terry and other senior managers believed that the publicity of such a battle "would likely inflict the very damage we were seeking to avoid." Moreover, the senior executives believed that disclosing the DIP Lenders' declaration of default in a public filing with the SEC would have severe consequences and could damage the Debtors' businesses. By entering into the First Amendment before being required to file the 10–Q disclosure with the SEC, the Debtors avoided a public disclosure of the declaration of default.

Second, although the Debtors firmly believed that they were not in default of the DIP Credit Agreement, the senior executives realized that there were risks in publicly litigating that issue. For one thing, they recognized that there was no assurance that the Debtors would prevail in a legal challenge to the DIP Lenders' action. When pressed, Terry testified that he was advised that there was perhaps a 20% chance that the Debtors might lose in any such litigation. Rhodes stated that there could not be 100% certainty that the Debtors would prevail. Additionally, the senior executives recognized, as noted above, that such a public fight—win or lose—could have a severe impact on the Debtors' business operations and could seriously undermine customers' confidence in the Debtors' prospects for continuing in business.

Third, the executives testified that approval of the First Amendment would not adversely affect the Debtors' ability to effectively run their business operations. The executives testified that, based on their analyses, the Debtors would have approximately $100,000,000 in liquidity under the DIP Credit Agreement after the sale of various assets, despite the reduc-

tions in the financing commitment required by the First Amendment. That is the same amount of liquidity that the Debtors have had prior to execution of the First Amendment. Since the bankruptcy filing, the Debtors have been diligent in reducing the bank debt. According to Terry, the Debtors' total debt (term and revolving) to the DIP Lenders was approximately $400 million when the bankruptcy petition was filed on May 31, 2002, and the debt has now been reduced to approximately $260 million to $270 million. Assuming proceeds of nearly $200 million from the sale of the Fertilizer Assets—a sale that has now been approved by the Court and is pending a closing—the debt will be reduced to approximately $60 million. When the debt is reduced to less than $100 million, the Debtors will receive a 45–day extension on certain deadlines that are contained in the First Amendment for the marketing and sale of assets.

Fourth, according to Terry and Rhodes, the Debtors will be able to meet the deadlines established in the First Amendment for the marketing and sale of assets. The timelines established allow more time for the sale of assets than the Debtors had previously proposed in negotiations with the DIP Lenders. Rhodes testified that the DIP Lenders had never asked the Debtors to accept deadlines that were more stringent than the Debtors had already proposed themselves, and in his view the deadlines contained in the First Amendment will not cause a "fire sale" of the Debtors' assets.

Fifth, the out-of-pocket cost to the Debtors to enter into the First Amendment will be approximately $1.4 million, before taking into account interest savings that will be realized from the termination of the $25 million Tranche A revolving facility and the debt reductions realized as a result of asset sales. These costs consist of

$691,300 in an "amendment fee" to Deutsche Bank and approximately $700,000 in default interest paid by the Debtors from December 9, 2002, until the entry of the Court's Interim Order on March 3, 2003, which directed the DIP Lenders to immediately cease charging interest at the default rate. These costs are a small fraction of the Debtors' annual revenues of several billion dollars.

Finally, by entering into the First Amendment, the Debtors obtained an extension of time, by agreement of the DIP Lenders, until March 31, 2003, to file a Disclosure Statement in support of their plan of reorganization. This will afford the Debtors additional time to complete asset sales and analyze their impact on the Disclosure Statement and plan of reorganization, without a concern that the extensions will be opposed by the DIP Lenders.

### 2. The Committees' evidence

The Creditors Committee and Bondholders Committee focused their direct evidence on whether the First Amendment was in the best interests of the Debtors on two scores: Whether the Debtors could reasonably be expected to meet the timelines for the marketing and sale of assets, as contained in the First Amendment, and whether the Debtors would have sufficient liquidity to continue their business operations in light of the reductions in funding availability required under the First Amendment.

### A. The Bondholders Committee's evidence

Van Winkle, the Bondholders Committee's expert witness, testified that the timelines set out in the First Amendment for the marketing and sale of assets were unreasonable and, for the most part, unwise.[11] Van Winkle testified by declaration to the following:

(1) The use of milestones—particularly provisions that make it an event of default if the Debtors fail to meet them—creates unacceptably high risk from the point of view of the Debtors, their bankruptcy estate, and the bondholder constituency.

(2) Deadlines such as those in the First Amendment have the potential to destroy value by placing leverage in the hands of buyers, or forcing the Debtors to make less than optimal decisions to avoid defaults under the DIP Credit Agreement.

(3) It is inappropriate to impose deadlines on the Debtors when the achievement of the deadlines is out of the Debtors' control. Even though the Debtors might use their best faith efforts to sell assets, Van Winkle stated, events outside the Debtors' control could force them to miss a milestone and face the consequences of an event of default.

(4) The existing sale process schedules for the sale of the Fertilizer Assets and Beef Assets were developed to facilitate and guide the sale process, not for use as DIP Credit Agreement deadlines.

(5) The mergers and acquisition process is a fluid process in which concessions to a

---

11. Van Winkle is a director of Ernst & Young Corporate Finance LLC, ("Ernst & Young") the Bondholders Committee's financial advisor in this case. He earned a Masters in Business Administration, with a concentration in finance, from the University of Michigan. Between 1990 and 2000, Van Winkle worked for Continental Bank and Bank of America in Chicago in commercial loan work- outs, leveraged loans (those primarily supported by cash flow rather than assets), mergers and acquisitions, and in special situations involving distressed bank debt and public bonds. He has been with Ernst & Young since November 2000, and has handled between eight and 10 restructuring engagements.

detailed schedule are regularly made due to unforeseen circumstances or in a good faith attempt to maximize value.

(6) The Debtors have demonstrated that they are committed to a process to market and sell their Fertilizer Assets and to market the Beef and Pork Assets with a view toward sale, and do not need further incentives in the form of deadlines. Van Winkle noted that the Debtors had retained several financial advisors, investment bankers and others to assist in the marketing and sale of assets.

(7) On the assumption that the DIP Lenders are oversecured, the inclusion of deadlines in the First Amendment suggests that the DIP Lenders are more concerned with the speed of the sales than they are with the maximization of value to the bankruptcy estate. Van Winkle concluded that the DIP Lenders are vastly oversecured, with an equity cushion of between 286% and 415%. The sale of the Fertilizer Assets, due to be concluded in April, will pay down the bank debt by more than 50%, resulting in an even greater disproportion between debt balances and asset values. Therefore, Van Winkle believes that the imposition of deadlines in the First Amendment will only serve to destroy the value of the estate, to the detriment of the unsecured creditors and yet will be of no particular value to the DIP Lenders.

(8) The deadline for the Debtors to complete a marketing plan and take other steps for the sale of its interest in U.S. Premium Beef will make meeting this deadline more complicated than originally contemplated by Goldsmith, Agio, Helms & Lynner, LLC ("Goldsmith, Agio"), the investment banker hired by the Debtors to assist in that sale. This difficulty arises because Farmland is not a 100% owner of U.S. Premium Beef and is not in control of the information or processes relating to a sale of its interests in that entity.

(9) Van Winkle does not believe that the Debtors will be able to meet the First Amendment deadline for the identification of lead bids and lead bidders for the Beef Assets, due to circumstances beyond the Debtors' control. Alternatively, the ultimate bid received might be diminished because a bidder that is aware of the deadline could intentionally "lowball" its offer or drag its feet on an offer, forcing the Debtors to make concessions in order to meet the deadlines. Such tactics could affect the ultimate value received for the asset.

(10) The actions required of the Debtors to meet a deadline for the approval of a sale of the Beef Assets may ultimately be outside the control of the Debtors. These actions would include approval of the Department of Justice with respect to possible antitrust violations.

In his oral testimony, Van Winkle asserted that the deadlines would, in his opinion, prevent the Debtors from obtaining maximum value from the sale of their assets. If buyers know of sales deadlines, or if the Debtors are forced to sell assets because of deadlines, they will be forced to accept lower prices for their assets than they might otherwise obtain, he testified. Considering all the circumstances, Van Winkle believes that the deadlines are unreasonable.

With respect to the possible problems with financial liquidity posed by the First Amendment, Van Winkle made the following points:

(1) Varying and changing projections made by the Debtors as to their cash availability—with a variation in excess of $50 million—demonstrates how volatile and changeable the Debtors' cash flow and liquidity needs can be.

(2) Tranche A, which provided essentially a $25 million line of credit for the Debtors, should be retained as a cushion, rather than given up as provided in the First Amendment, because many of the required sales-related events have not occurred and because of uncertainties in the Debtors' businesses, particularly the spring fertilizer business. "For a debtor in bankruptcy, especially one that experiences such a high degree of volatility in its business operations as Farmland does, to forego any liquidity cushion, especially a $25 million one, is not prudent."

(3) The Debtors' most recent funding availability forecast prepared in February showed a decline of $16.4 million between March 30, 2003, and April 20, 2003.

(4) Van Winkle was critical of the Debtors for relying on their past history of exceeding their projections and on other income-producing events, such as sales of non-core assets, receipt of insurance proceeds, and distributions from joint ventures.

(5) Van Winkle was also critical of the Debtors for not attempting to undertake a "rigorous evaluation of availability" in a downside scenario. The Debtors projected what would happen to their funding availability if their consolidated cash flow should be reduced by 20%. Van Winkle stated that the 20% was arbitrary and not based on the Debtors' actual historical performance or any defined future risks that might affect cash flows. Additionally, Van Winkle testified that the 20% reduction is flawed because it is based on the Debtors' consolidated cash flow, rather than a 20% reduction in the operations of each of the Debtors' businesses.

(6) Funding availability projections made by Ernst & Young, based on a 20% downside projection for each operating segment of the business, results in significant availability shortfalls.

(7) The First Amendment provides for insufficient availability for the Debtors to insure that they will be able to conduct their business in the ordinary course, free of liquidity issues. Due to the nature of their businesses, the Debtors experience significant variances in their forecasts, both on a one-week basis and on a 13-week basis (the period used for most projections by all parties here).

(8) The Debtors have missed their weekly forecasts of cash flow by wide margins in the millions of dollars.

(9) The Debtors' outlook and forecasts are constantly changing, and the unpredictable and volatile nature of the Debtors' businesses makes it imprudent to "cut it too close" with respect to liquidity.

(10) The Debtors have not forecast their liquidity needs between May 11, 2003, and the maturity of the DIP Credit Agreement (November 30, 2003).

(11) The "volatility analysis" of the Debtors is potentially conservative because of the Debtors' need for large amounts of capital in the spring fertilizer season.

(12) The level of the DIP commitment and financial flexibility of the Debtors is of utmost importance to their customers and vendors.

In his oral testimony, Van Winkle testified that there is a great likelihood that the Debtors won't have sufficient liquidity to operate their businesses in the coming months. A combination of the deadlines for sales of assets and insufficient liquidity could destroy value, in his opinion. The First Amendment, Van Winkle testified, leaves the Debtors susceptible to a liquidity crisis.

## B. The Creditors Committee's evidence

The primary witness presented by the Creditors Committee was Niemann, a di-

rector and shareholder of Houlihan Lokey Howard & Zukin ("Houlihan Lokey"), the Creditors Committee's financial advisors.[12] Niemann testified that the First Amendment is harmful to the interests of the Debtors' bankruptcy estate, for several reasons:

(1) The Debtors complied with the specific provisions of the DIP Credit Agreement requiring the filing of a plan of reorganization within the first 180 days of the case.

(2) Assuming that the DIP Lenders' consent or approval was required for the plan—which he does not believe was necessarily the case—the DIP Lenders were unreasonable in withholding their consent or approval of the plan filed by the Debtors.

(3) The DIP Lenders failed to negotiate a covenant concerning the Debtors' commitment to sell specific assets in the original DIP Credit Agreement and—by means of the notice of default and threatened cessation of funding—have extracted the First Amendment from the Debtors so as to obtain what the DIP Lenders either overlooked or were unable to obtain in the original DIP Credit Agreement—that is, a definite schedule for the sale of assets.

(4) Given the pending sale of the Debtors' Fertilizer Assets, the DIP Lenders' exposure will be significantly reduced to a level where the DIP Lenders could be refinanced at par from the Debtors' Pork Assets alone (not to mention other assets owned by the Debtors).

(5) The DIP Lenders are oversecured.

(6) The DIP Lenders received significant economic consideration and significantly improved their position in the original DIP Credit Agreement, and the First Amendment takes away the only consideration the Debtors and the Creditors Committee received in exchange under the original DIP Credit Agreement, namely the $25 million of availability in Tranche A. Niemann conceded, however, that the Debtors might not need Tranche A beyond May 2003.

(7) Certain covenants in the First Amendment are beyond the Debtors' control and are not prudent given the Debtors' assets.

(8) The First Amendment significantly increases the Debtors' risk of defaulting, compared to the risk of default under the DIP Credit Agreement, because the First Amendment—unlike the DIP Credit Agreement—contains concrete deadlines that are easy to ascertain. Thus, there is a far greater risk that an event of default could be declared.

(9) The First Amendment may restrict the liquidity of the Debtors such that they may not be able to operate through the maturity of the DIP Credit Agreement.

(10) The information the Debtors relied on in entering into the First Amendment is insufficient to determine whether the Debtors have sufficient liquidity through the maturity of the DIP loan.

(11) The First Amendment may impair value for the unsecured creditors.

(12) The actions of Deutsche Bank, as Agent for the Lenders, in conjunction with the First Amendment have caused some

---

**12.** In his declaration, Niemann stated that he is a member of Houlihan Lokey's financial restructuring group, and that he personally sells several distressed companies each year. Niemann estimated that he has sold over 60 distressed businesses over the last 14 years.

Niemann is a lawyer. In the 14 years since he graduated from law school, Niemann has spent about one-half his professional life as a practicing attorney and the other one-half as a financial advisor.

risk to value for both the DIP Lenders and the unsecured creditors, but the entirety of the risk is borne by the unsecured creditors.

(13) The proper course that the DIP Lenders and the Debtors should have taken would have been to seek the Court's summary determination of whether a default had occurred, so as to avoid the risk associated with public disclosure of the event of default. Niemann testified that he believed that the Debtors would have had a "good chance" of winning the issue of whether a default had occurred, had that issue been presented to the Court. However, Niemann conceded on cross examination that he had no reason to think that the DIP Lenders would have agreed to such a summary determination, or that he knew that such a summary determination was even possible in the bankruptcy court.

Niemann testified that the DIP Lenders had effectively "bootstrapped" what was an alleged and dubious event of default— the failure to file a Lender-approved plan of reorganization by November 27—into concrete and measurable defaults under the First Amendment. According to Niemann, the imposition of marketing and sales deadlines on the Debtors necessarily means that the Debtors will not receive full value for their assets. The mere existence of deadlines, he stated, is a detriment because the Debtors are then under a compulsion to sell assets. Niemann testified that he believed it was very unlikely that the DIP Lenders would have terminated funding in November or December, but he acknowledged that a termination of financing would have had a catastrophic effect on the Debtors' businesses. Stopping funding by the Lenders would not have made economic sense, in his opinion.

**D. Did the DIP Lenders unreasonably withhold their approval of the Debtors' proposed plan of reorganization, and was their declaration of a default in the DIP Credit Agreement a pretext to coerce the Debtors into agreeing to new and different financing terms more favorable to the DIP Lenders?**

**1. The Committees' evidence.**

Because the issues set out in the immediately preceding paragraph were interjected by the Committees, the Court will first look at the evidence adduced by the Committees on these issues. Primarily, the Committees sought to establish that the DIP Lenders had not told the Debtors exactly what they expected to be included in the plan of reorganization, and therefore the DIP Lenders were unreasonable in refusing the approve the plan filed by the Debtors on November 27. The Committees further contend that the DIP Lenders' refusal to approve the Debtors' proposed plan of reorganization was a pretext to allow the DIP Lenders to extract more favorable DIP financing terms from the Debtors. Initially, the Court would observe that much of the Committees' evidence on this point was sought to be established through cross examination of the Debtors' officers and Deutsche Bank's loan officer, Albert Sun. The Court will review this cross-examination evidence, though much of it is not particularly helpful to the Committees' cause.

No testimony was adduced to demonstrate that the DIP Lenders ever specified exactly what provisions had to be included in the Debtors' plan of reorganization so as to obtain the DIP Lenders' approval of that plan. In its letter of December 9 declaring the Debtors to be in default of the DIP Credit Agreement, the DIP Agent's attorney stated that the single most important reason for not approving

the Debtors' proposed plan was that the Debtors had failed to adequately identify and commit to *how* the Debtors would pay the DIP Lenders on the effective date of the plan. "The Debtors have repeatedly reneged and temporized from commitments to sell assets in order to finance repayment of the Lenders. The Plan is a continuation of this approach," counsel for Deutsche Bank wrote in the letter of December 9.

All of the parties acknowledged that there had been numerous discussions concerning the sale of assets by the Debtors as a means to pay down the bank debt. Sun had discussions in April and May 2002 with officers at Farmland in which the officers stated that the company would sell up to $500 million in assets, including the Beef Assets, to pay its bank debt. Sun regarded these statements as a commitment by the Debtors to sell the assets necessary to pay the banks. In September and October, Sun advised the Debtors that they needed to show the DIP Lenders a firm commitment for the sale of assets, and that a failure to meet that commitment would result in a default. With respect to the plan of reorganization, the Lenders wanted specific details as to how the Debtors would raise the money to pay the Lenders as well as other creditors.

The Lenders were not satisfied with general guidelines for the sale of assets because the Debtors had repeatedly promised in the past that they would sell assets to pay down the bank debt, but they had failed to do so. Sun noted that the Debtors had been attempting, without success, to sell their Fertilizer Assets since well before the bankruptcy filing. After the filing, Terry equivocated (in Sun's view) on a program for the sale of assets. On redirect examination, Sun testified that he did not believe the Debtors had made diligent efforts to sell the Beef Assets or other assets post-petition.

Sun reiterated that the Lenders were particularly concerned that the Creditors Committee had disapproved the Debtors' proposed plan of reorganization and had terminated exclusivity as to the Creditors Committee; this reinforced the DIP Lenders' belief that the proposed plan was not confirmable.

Sun acknowledged that the Debtors had never been refused to provide any information that he had requested, and further acknowledged that the DIP Lenders are adequately secured now, as they were when the loan originated in February 2002 and when the DIP Credit Agreement was signed in June 2002.

Terry, the Debtors' CEO, temporized on whether he had promised the banks that the Debtors would sell $500 million in assets to pay down the debt. At one point, Terry denied that he had made such a promise, but he acknowledged that the Lenders were aware of the "sense of the Board" resolution directing management to proceed with the sale of assets to pay off the bank debt. In the rebuttal phase of the hearing, Terry stated that the Lenders were always intent on what the Debtors were going to do, but Terry insisted that the banks knew that the Debtors wanted to develop a strategic plan for the sale of assets.

On one point there is no dispute: The Debtors would not have entered into the First Amendment but for the declaration of default by the DIP Lenders and their threat to terminate funding for the Debtors.

## 2. The Debtors' evidence

While the Debtors vigorously contend that their proposed plan of reorganization complied with the requirements of the DIP

Credit Agreement and that they were, therefore, not in default under the terms of that agreement, the Debtors have adduced very little evidence to demonstrate that the DIP Lenders unreasonably withheld their approval of the proposed plan of reorganization, or that the declaration of default was a pretext to extract more favorable terms for the DIP financing from the Debtors.

The Debtors filed their proposed Plan on November 27, 2002, the deadline originally set by the DIP Credit Agreement. Prior to filing that Plan, the Debtors had circulated one or more draft plans to the DIP Lenders, but the Lenders had refused to approve those proposals. The Plan filed by the Debtors proposed that the DIP Lenders would be paid in full on the effective date of the Plan, and the effective date of the Plan was prior to the maturity of the DIP loans on November 30, 2003. The Plan (Committees' Ex. 126) did not, however, set out in any detail how or when the Debtors would obtain the funds necessary to pay the DIP loans in full, nor did it provide the amounts that would be paid to the general unsecured creditors, among other things.

Rhodes testified that he believed the Debtors' Plan, at the time it was filed, complied "in every respect" with the requirements of the DIP Credit Agreement. "At all times, Debtors believed that the filing of a Plan of Reorganization which provided for payment, in full, on the effective date would be in compliance with the terms of the DIP Agreement as negotiated by the parties—particularly given the DIP Lenders' involvement and knowledge with regard to the reorganization process," Rhodes stated in his affidavit. Rhodes also testified that the Debtors believed that the filing of a plan of reorganization that provided for payment in full of the debt to the DIP Lenders on the effective date would be in compliance with the terms of the DIP Agreement.

According to Vance, the Debtors had been worried from the outset about the requirement that a plan of reorganization be filed by November 27, 2002, just six months after the filing of the bankruptcy petition. Vance testified that the Debtors were assured that the November 27 plan deadline was designed solely to ensure that the Debtors were making progress in the reorganization process and that the Debtors were not "hiding out" in bankruptcy. In the weeks leading up to November 27, the Debtors, Deutsche Bank, and the DIP Lenders engaged in numerous discussions regarding the Debtors' restructuring progress and the possibility of the Debtors' obtaining a waiver of the November 27 deadline. On September 4, 2002, the Debtors made a presentation to the DIP Lenders to update them on the progress the Debtors were making on their restructuring strategy. On September 12, Sun, the loan officer who supervised the Debtors' account at Deutsche Bank, requested detailed information from the Debtors so that he could evaluate their request to extend the November 27 deadline. On September 20 and October 11, the Debtors provided to the DIP Lenders detailed responses, including such things as cash flow projections, projected debt repayments and sales of certain assets, projections of overhead cost reductions, and projections of available collateral at the end of the cash flow period. The Debtors projected that they would be able to reduce their total debt (both term and revolver) to approximately $26 million by the end of March 2003.

After they received this information from the Debtors, the DIP Lenders provided a draft of the First Amendment to the Debtors. The Debtors' management team evaluated the proposal and respond-

ed to the DIP Lenders on October 25, and stated their intention to file a plan of reorganization by November 27 so that there would be no event of default under Section 8.13 of the DIP Credit Agreement. Subsequently, Rhodes told the DIP Lenders that the commitment reduction schedule proposed by the DIP Lenders would be extremely difficult for the Debtors to meet. A number of drafts of a plan of reorganization were exchanged between the Debtors, the Committees, and the DIP Lenders before November 27, but an agreement could not be reached on a final plan. The Debtors filed their plan of reorganization on November 27 without having obtained the approval of the DIP Lenders for the plan filed.

On that same day, November 27, the DIP Lenders gave the Debtors a temporary waiver of compliance with Section 8.13 of the DIP Credit Agreement, until December 4, so as to allow the DIP Lenders to review the plan of reorganization and to determine a course of action if they determined that an event of default existed. The DIP Lenders also warned the Debtors that the temporary waiver could be revoked at any time and that the DIP Lenders could invoke any and all available remedies, including acceleration of all amounts due and termination of all funding. The Debtors decided to attempt to negotiate a short-term amendment to overcome the plan-filing deadline. They believed that if they could negotiate for additional time through January 31, 2003, new financial data from asset sales would be available and they would be better able to determine the precise terms of a repayment schedule and could possibly commit to a more significant paydown schedule. In a telephone conference on December 3, the Debtors proposed the January 31, 2003, deadline, but the DIP Lenders failed to respond to that proposal, making it apparent to the Debtors that it was unacceptable.

Vance then took the lead in attempting to negotiate an amendment to the DIP Credit Agreement. On December 2, he was told that the DIP Lenders had not approved the plan of reorganization filed by the Debtors on November 27. Deutsche Bank advised the Debtors that they would be sent a notice of default, that the banks would start charging interest at the default rate, that Tranche A would be eliminated, and that the letters of credit issued under Tranche A would have to be cash collateralized or rolled over to Tranche B. Extensive discussions and negotiations continued on the following days. On December 4 and again on December 5, Deutsche Bank gave the Debtors one-day extensions of the temporary waiver of compliance with Section 8.13. Negotiations broke down, however, and the DIP Lenders notified the Debtors on December 9 that they were in default of the DIP Credit Agreement. On December 10, the Debtors notified the DIP Lenders that the Debtors disagreed that an event of default had occurred.

Despite the breakdown of negotiations, the Debtors' senior management continued to meet and discuss the ramifications of a public dispute with the DIP Lenders. Cognizant of an impending January 14, 2003, filing deadline with the SEC that would require disclosure of the declared default, the Debtors determined that it was in the best interests of the estate to continue to try to reach a compromise with the DIP Lenders rather than engage in a potentially damaging public dispute. After several days of further negotiations, the Debtors and the DIP Lenders reached agreement on the First Amendment on January 5, 2003, and executed the agreement on January 8, 2003.

The Plan filed by the Debtors on November 27 has been described as a "bare bones" plan. With respect to the debt owed the DIP Lenders, the Plan simply stated: "The DIP Loan Claims shall be paid in full on the Effective Date according to the terms of the DIP Credit Agreement. Notwithstanding anything in the Plan to the contrary, the DIP Loan Claims shall have the superpriority status set forth in the orders authorizing and evidencing the DIP Loan Claims." (§ 3.1(c), Committees' Ex. 126) There are several incomplete areas. The Plan does not state how the Debtors would obtain exit financing. It does not state what the general unsecured creditors would receive. It does not state when or how assets would be sold to generate funds needed to pay down debt.

The Plan filed by the Debtors did not set out any timelines or deadlines for the sale of assets, although they had been engaged in discussions with the Lenders for several months concerning when and how and in what amounts assets would be sold. At one point, the Debtors stated that such details were not appropriately included in a plan of reorganization, but instead should be set out in a disclosure statement. However, the Debtors did not file a disclosure statement on November 27; rather, they sought and obtained an extension of time, until January 15, 2003, to file the disclosure statement. That deadline has since been extended.

**2. The DIP Lenders' evidence**

In addition to evidence its attorney elicited from the Farmland officers in open court, Deutsche Bank offered the testimony of Albert Sun, a director at Deutsche Bank who was responsible for overseeing the Debtors' account, by affidavit and in person.

According to Sun, prior to the Petition Date, the then-CEO of Farmland and one of its Board members had notified Sun that the Board of Directors had directed management to sell any and all of the Debtors' assets, up to $500 million, to enable the Debtors to fully repay the Debtors' bank lenders. In early May 2002, at a meeting in Farmland's headquarters in Kansas City, officers of the Debtors reiterated to Sun that up to $500 million in assets would be sold so the Debtors could repay their bank debt in full. Sun was told that the Debtors' liquidity crisis had reached a point where assets would need to be sold. At about this time, Terry replaced Robert Honse as the CEO of Farmland, and shortly thereafter Terry advised Sun that Farmland was retaining UBS Warburg ("Warburg") to develop a strategic plan for the divestiture of assets and to manage that divestiture.

Approximately a week before the Petition Date, the Debtors asked the banks to provide the Debtors with DIP financing. Within a matter of days, the Debtors and the banks negotiated the DIP Credit Agreement that was signed on June 5, 2002, five days after the Debtors filed bankruptcy. In negotiating the DIP Credit Agreement, Terry reaffirmed to Sun that the Debtors were committed to selling up to $500 million in assets, including one of the Protein Assets. Sun believed that he had made it clear that the Lenders expected the Debtors to sell one of the Protein Assets to pay debt. During these negotiations, Terry informed Sun that it was not feasible to place specific covenants in the Interim DIP Credit Agreement regarding the sale of assets because Warburg had just been retained and the Debtors and Warburg did not yet know when and how particular assets would be sold. The Debtors told Sun that a strategic plan for the sale of assets would be ready by approximately the middle of June.

According to Sun, Deutsche Bank and the other DIP Lenders relied in good faith on the Debtors' commitment to sell up to $500 million in assets to repay the lenders in full. To assure that they would receive a clear, feasible plan as to how the Lenders would be repaid, the DIP Lenders required the Debtors to file a plan of reorganization acceptable to all DIP Lenders within 180 days after the Petition Date. The DIP Credit Agreement, negotiated at the time the Debtors filed bankruptcy, did not include any detailed program for the Debtors' sale of assets because the DIP Credit Agreement was negotiated in a matter of days (approximately a week) and there was insufficient time to include it. Instead, the DIP Credit Agreement provided, in Section 6.9, that no later than the entry of the Final Order approving the DIP financing, the Debtors would deliver a plan for conducting systematic asset sales (the "Asset Sales Program") designed to pay their debts. Section 6.9 required that the Asset Sales Program specify the assets to be sold, the prices at which the assets were to be marketed, the anticipated timing of the sales, and the identity of sales agents, brokers, and/or investment bankers that would be retained in connection with the program. It also required the Debtors and their subsidiaries to use their best efforts to consummate the asset sales that were detailed in the program.

Sun testified that the Asset Sales Program was designed to address only the "low hanging fruit," those assets that both the Debtors and the Lenders knew would be sold, and Terry was informed that other assets would likely have to be sold for the Debtors to propose a plan of reorganization that would be acceptable to the DIP Lenders. Sun testified that Terry acknowledged that an acceptable strategic plan and plan of reorganization would likely require the sale of additional assets, and

that the Debtors were prepared to accommodate those requirements.

In the summer of 2002, Sun became increasingly concerned about the Debtors' delay in preparing a strategic business plan. On July 23, 2002, Sun wrote a letter to Terry expressing his concerns about this delay. (Sun Ex. 2) Sun had become aware that Smithfield Foods, Inc. ("Smithfield") was interested in acquiring the Protein Assets, and he had several conversations with the Debtors regarding Smithfield's interest. In conversations and in letters, Sun and another Deutsche Bank director, Albert Fischetti, encouraged the Debtors and their Board of Directors to investigate the Smithfield offer. Farmland did not respond.

On September 4, 2002, the Debtors presented their restructuring strategy to Deutsche Bank and the Committees. After that meeting, Sun was concerned that the Debtors were tentative in carrying out the asset sales that had been discussed and that were described in the business plan. In the following weeks, Sun became even more concerned with the lack of progress the Debtors were making in asset sales. According to Sun, he reminded the Debtors' management on several occasions that the DIP Lenders expected that either the Beef Assets or the Pork Assets would have to be sold in connection with any plan of reorganization and that the DIP Lenders would not approve a plan of reorganization that did not set out clear means by which the Lenders would be paid in full.

At some point in the fall of 2002, the Debtors approached Deutsche Bank and requested a waiver of the requirement in Section 8.13 that a plan of reorganization be approved by the DIP Lenders and filed by November 27. The Lenders sent a draft of a potential waiver to the Debtors, and negotiations then took place over the

following weeks. As previously indicated, an agreement could not be reached.

In November 2002, the Debtors submitted two drafts of a plan of reorganization to Deutsche Bank, as Agent for the DIP Lenders, for review and comment. Sun found the first draft unacceptable. The plan did not address with specificity how and when the Lenders' notes would be paid, the very issue that Sun had told the Debtors was critical to the DIP Lenders' acceptance of a plan. Sun was concerned that the proposed plan "appeared to be. more of an outline than a specific plan of reorganization." (¶ 25, Sun Declaration) He was also concerned that the plan did not indicate that agreements had been reached with other creditors for the payment of their debts, and that the plan did not indicate whether the Debtors would reorganize or liquidate. Counsel for Deutsche Bank notified counsel for the Debtors on November 11, 2002, that the first proposed plan was unacceptable. (Sun Ex. J) Subsequently, Sun received and reviewed a second proposed plan of reorganization, and he also found it unacceptable, inasmuch as it had not addressed his previous concerns. On November 25, Deutsche Bank's attorney sent a letter to the Debtors' counsel again outlining the Lenders' problems with the proposed plan. (Sun Ex. K) This letter specified several issues that the DIP Lenders wanted to have clarified, and stated:

"At the risk of putting too fine a point on the matter, we find it very hard to imagine that the Banks would consent to a plan that does not map practical, concrete steps by the Debtors to pay the Banks within a reasonable period of time. This Plan does not satisfactorily address this baseline concern." (Sun Ex. K, p. 3)

The Plan that was filed with the Court on November 27 was not submitted to the DIP Lenders for approval before it was filed. Despite the fact that the filed Plan did not address the Lenders' concerns, Sun recommended a reasonable forbearance to try and work the problems out before the DIP Lenders declared a default. As discussed previously, those negotiations failed, and the DIP Lenders declared a default on December 9.

In the DIP Lenders' December 9 letter, counsel spelled out the primary deficiencies in the plan filed by the Debtors:

The DIP Agent will not state each and every reason that the Plan is not approved. DIP Agent's counsel has provided extensive comments on drafts of the Plan to which the DIP Agent refers. The primary basis for not approving the Plan is that the failure of the Debtors to adequately identify and commit to—either in the Plan, a disclosure statement or otherwise—how the Debtors will pay the Lenders in full on the effective date.[sic] While the Debtors in the final version of the Plan actually filed added substantial "window dressing", it still does not adequately address payment of the Lenders. The Plan states that the Debtors may enter into "Exit Financing" for part of the debt, but notwithstanding request and the notification requirements of the DIP Credit Agreement, the Debtors have provided no basis to believe this financing is available (and it is stated to be only for part of the debt). The Plan states that the Debtors may enter into "Restructuring Transactions" but provides no description of what actions—if any—will constitute the "Restructuring Transactions" or basis to determine when they will occur or to conclude that sales will actually occur. The Plan fails to specify whether or what assets of the Debtors will be sold or on what time period. Simply put, the Plan provides no reasonable basis by which the Lend-

ers will ever be paid in full, let alone on the effective date. When the terms of the DIP Credit Agreement were negotiated, the DIP Agent made very clear that the provisions of a plan demonstrating how the Lenders would be paid and the likelihood of timely achieving such results would be critical to any decision by the DIP Lenders to approve a plan of reorganization.

(Debtors' Ex. 2, p. 3)

Additionally, on November 29, 2002, the Debtors delivered to Sun an officers' certificate and an accountants' certification letter from KPMG, LLP, which contained a "going concern" exception that violated Section 6.1(iii) of the DIP Credit Agreement. Sun became even more concerned when, on December 6, 2002, counsel for the Creditors Committee sent a letter to the Debtors formally rejecting the Plan and terminating the Debtors' exclusive right (as to the Committees) to file a plan of reorganization. This letter emphasized to Sun that the Debtors did not have an agreement with their creditors on the key terms of a plan of reorganization, and that the potential for a significant delay in paying the DIP Lenders under a confirmed plan was real.

Sun estimated that the Debtors would save up to $500,000 annually under the First Amendment, as compared to their costs under the DIP Credit Agreement.

**E. Other evidence considered by the Court**

One of the early milestones in the First Amendment was a provision that, by January 28, 2003, the Debtors should have completed negotiations with a lead bidder or bidders with respect to a definitive asset purchase agreement for the Fertilizer Assets. The schedule further required that the sale of the Fertilizer Assets be closed and funded by April 15, 2003. Although the Debtors did not meet the January 28 deadline, the DIP Lenders on February 18, 2003, just days before the hearing, extended the date for achievement of this milestone to that same date, February 18. On February 17, the Debtors entered into two Stock and Asset Purchase Agreements (Comm. Exs. 140 and 141) with Koch Nitrogen Company ("Koch") for the sale of the majority of the Debtors' foreign and domestic Fertilizer Assets for a total purchase price of $271,500,000. The Debtors then filed a motion to establish bid and auction procedures for the final sale of the Fertilizer Assets, with Koch as the lead or "stalking horse bidder." On the basis of this development, the DIP Lenders notified the Debtors in their February 18 letter that the required milestone had been "timely achieved."

On April 1, 2003, pursuant to the bid procedures, the Court approved the sale of the Fertilizer Assets to Koch Industries for a final sales price of approximately $293 million, almost two-thirds of which will be employed to reduce the Debtors' debt to the DIP Lenders.

The parties also offered into evidence various portions of the deposition of Kevin Jach, an employee of Goldsmith, Agio, the investment banker employed by the Debtors (with Court approval) to assist in the marketing and sale of the Protein Assets.

—Jach testified that, based on early but incomplete analyses, the enterprise value of the Debtors' Protein Assets would be between $775 million and $925 million; however, since Farmland does not own the Beef Assets in their entirety, those values would have to be reduced to reflect the actual percentage of Farmland's ownership in the Beef Assets.

—Jach testified that the Debtors did not have an opportunity to consult with Goldsmith–Agio concerning the timelines con-

tained in the First Amendment before entering into the First Amendment. Jach acknowledged that some factors with respect to the sale of the Beef Assets—for example, the fact that there is a co-owner of those assets or there might be a need to obtain Department of Justice approval—could be beyond the control of the Debtors and Goldsmith–Agio and thereby affect compliance with the milestones in the First Amendment.

—While acknowledging that there were many variables, Jach generally believed that the Debtors and Goldsmith–Agio could meet the milestones set out in the schedules incorporated in the First Amendment.

There was little evidence of possible alternative financing that would be available to the Debtors. At one point, Niemann suggested that the Debtors talk to Congress Financial Corporation, and on November 19, 2002, a vice president of Congress Financial wrote a letter (Committees' Ex. 150) to Rhodes offering to underwrite a secured revolving credit facility of up to $180 million. At the time, this would have covered approximately one-half of the Debtors' debts to the DIP Lenders. No commitment letter was ever issued, and the Debtors did not pursue the possibility of obtaining partial funding from Congress Financial.

**13.** Those subsections provide:

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

## DISCUSSION

The Debtors obtained approval of the original DIP Credit Agreement with the DIP Lenders pursuant to 11 U.S.C. § 364(c) and (d).[13] The parties have suggested, with varying degrees of enthusiasm, that the Court should apply in this matter the four-factor test for approval of § 364 post-petition financing articulated by the bankruptcy courts in *In re Western Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D.Colo.1997), and *In re Phase–I Molecular Toxicology, Inc.*, 285 B.R. 494 (Bankr. D.N.M.2002). The four factors enumerated by those courts, on which the debtor has the burden of proof, are:

(1) That the proposed financing is an exercise of sound and reasonable business judgment;

(2) That no alternative financing is available on any other basis;

(3) That the financing is in the best interests of the estate and its creditors; and

(4) As a corollary to the first three points, that no better offers, bids, or timely proposals are before the court.

Two additional considerations were earlier suggested by the bankruptcy court in *In re The Crouse Group, Inc.*, 71 B.R. 544 (Bankr.E.D.Pa.1987). Those are:

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(c) and (d).

(1) That the credit transaction is necessary to preserve the assets of the estate, and

(2) That the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In *In re WorldCom, Inc.*, 2002 WL 1732646, at *3 (Bankr.S.D.N.Y.2002), Judge Gonzalez gave consideration to still other factors:

(1) That the financing is necessary, essential, and appropriate for the continued operation of the Debtors' businesses and the preservation of their estates, and

(2) That the financing agreement was negotiated in good faith and at arm's length between the Debtors, on the one hand, and the Agents and the Lenders, on the other hand.

■ Quite clearly, all of the enumerated factors are factors that should be considered by a bankruptcy court in determining whether an *initial* § 364 post-petition financing agreement should be approved. In this case, however, we are confronted with an *amendment*—albeit an extensive one—to a post-petition financing arrangement that has already received the imprimatur of the Court. The question, then, is whether all of the factors that would apply to an *original* DIP financing agreement should be applied in determining whether to approve an *amendment* to an earlier Court-approved financing arrangement. Section 364 of the Bankruptcy Code speaks of a trustee or debtor-in-possession "obtaining credit" or "incurring unsecured debt," without distinguishing between original agreements and amended agreements, and the Court is unaware of any special statutory provisions or rules that deal strictly with amendments to financing agreements. Deutsche Bank suggested that there is no case law addressing the standards for approving an amendment to a DIP financing agreement, but the Bondholders Committee has directed the Court's attention to *In re Defender Drug Stores, Inc.*, 126 B.R. 76 (Bankr.D.Ariz. 1991), in which the bankruptcy court applied § 364 to a financing amendment that extended the maturity date of the post-petition financing and provided for the debtor to pay a 10% contingent enhancement fee as a condition for the extended maturity. Thus, there is some very limited precedent for applying the same standards to an amendment to post-petition financing arrangements as are applied to an initial request for such financing.

■ In our view, courts will need to determine on a case-by-case basis how high to raise the bar when considering amendments to post-petition financing. In many instances, the proposed changes to the DIP financing are relatively minor, and would not require extensive application of the factors that have been enumerated above. But in other cases, like this one, where the amendment makes extensive changes in the post-petition financing, where the amendment imposes new and potentially threatening requirements on the debtor, and where there are strenuous objections posed by creditors, it seems that the court should apply those same standards that would generally be applicable to an original request for approval of DIP financing. How stringently those standards or factors are applied would depend on the facts in each case.

Some of the factors are obviously inapplicable and would not need to be considered. For example, in the case of an amendment to a DIP financing arrangement, it is unlikely that the debtor would be considering or soliciting alternative financing proposals or "better offers;" if it were doing so, then the matter before the court might well be approval (or not) of

totally new and alternative financing with another lender. Moreover, in negotiating an amendment of existing credit facilities with a lender, it is unlikely that a debtor would be able to obtain alternative proposals or offers for bits and pieces of a financing package. That would simply be impractical. Therefore, those enumerated factors having to do with alternative proposals and other offers simply do not apply in the context of an amendment to existing financing.

■ The remaining factors, however, do seem to have application in the case of an amendment to existing financing, particularly where the amendment makes extensive changes in the post-petition financing package and where there is serious opposition by creditors to the proposal, as there are in this case. The Court believes that the applicable factors can be synthesized as follows:

(1) That the proposed financing is an exercise of sound and reasonable business judgment;

(2) That the financing is in the best interests of the estate and its creditors;

(3) That the credit transaction is necessary to preserve the assets of the estate, and is necessary, essential, and appropriate for the continued operation of the Debtors' businesses;

(4) That the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender; and

(5) That the financing agreement was negotiated in good faith and at arm's length between the Debtors, on the one hand, and the Agents and the Lenders, on the other hand.

■ The application of these five factors will enable the Court to reach a sound, reasoned decision on whether to approve an amendment to an existing DIP financing. Applying these five factors to the case before us, we are firmly convinced that, all things considered, the First Amendment to the DIP Credit Agreement between the Debtors and the DIP Lenders should be approved.

**1. The proposed financing is an exercise of sound and reasonable business judgment**

The Debtors and the DIP Lenders contend that the Debtors have exercised sound, reasonable business judgment in entering into the First Amendment; the Committees assert that they have not done so. The evidence establishes, to the Court's satisfaction, that the Debtors thoroughly considered their options and arrived at a sound, reasonable decision to enter into the First Amendment.

■ Under the "business judgment" rule, the management of a corporation's affairs is placed in the hands of its board of directors and officers, and the Court should interfere with their decisions only if it is made clear that those decisions are, *inter alia*, clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code. *See In re United Artists Theatre Company v. Walton*, 315 F.3d 217, 233 (3rd Cir. 2003); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985); *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (9th Cir. BAP 1992). "Business judgments should be left to the board room and not to this Court. (Citation omitted) Only in circumstances where there are allegations of, and a real potential for, abuse by corporate insiders, should the Court scrutinize the actions of the corporation." *In re Simasko Produc-*

*tion Co.,* 47 B.R. 444, 449 (Bankr.D.Colo. 1985). *See also In re DeLuca Distributing Company,* 38 B.R. 588, 591 (Bankr. N.D.Ohio 1984) ("The authority to operate the [Chapter 11] debtor's business necessarily includes the concomitant discretion to exercise reasonable judgment in ordinary business matters.").

Although the Debtors have consistently and vigorously denied that they were in default of the DIP Credit Agreement, they were confronted with the fact that the DIP Lenders had declared a default on December 9, 2002. The Debtors, as testified by their highest officers, then had a difficult decision to make: Should they challenge the DIP Lenders' declaration of an event of default in a public proceeding in the bankruptcy court, or should they attempt to negotiate their way around the alleged event of default?

Niemann, the Creditors Committee's expert, believed that the Debtors should stand and fight, by seeking an immediate, summary determination from this Court that the Debtors were not in default of the DIP Credit Agreement, on grounds that either the DIP Lenders had no right to refuse approval of the proposed plan of reorganization in the first instance or that they were unreasonable in their refusal to approve the Debtors' proposed plan. It is clear from the examinations of witnesses and the arguments of counsel that the Committees' attorneys believe that this is what the Debtors should have done. Niemann believed that the Debtors would have had a very good chance of winning the battle over the issue of whether a default had occurred. Although Niemann acknowledged that the effects on the Debtors' businesses would be catastrophic if an event of default was found to have occurred and financing was terminated by the DIP Lenders, he asserted that it was "very unlikely" that the Lenders would cease funding the Debtors.

However, the Debtors' officers believed that the prudent decision was to negotiate changes to the DIP Credit Agreement, even if it meant being saddled with some things they would not like. First, the Debtors were concerned that a public fight over their financing—and whether it was about to be terminated—would seriously damage their relationships with their customers and suppliers, particularly such major customers as Wal–Mart, Costco, and Subway. Second, even if they filed nothing in the bankruptcy court, the Debtors would be compelled to officially, publicly disclose the declared default in a 10–Q filing with the SEC in mid-January. At that time, the default would be a matter of record in the financial community, with serious consequences for the Debtors' financial future. The Debtors' officers were correct in wanting to avoid such a disclosure, which surely was not in the best interests of the Debtors. Third, if the Debtors had elected to contest the declaration of an event of default in this Court, they could have lost that battle, thereby placing their DIP financing in even greater jeopardy of being terminated. Even if they had fought and won, there can be little doubt that such a public fight would have seriously damaged their standing with customers and suppliers; business relationships are fragile enough in a Chapter 11 case, even when adequate DIP financing is unquestionably assured.[14]

Considering the adverse practical consequences that would have flowed from a decision to engage in a public fight over

---

**14.** The Court has had concerns that the present proceedings might have serious repercussions for the Debtors with their customers and suppliers, simply because of the adverse publicity generated by the dispute.

the correctness of the DIP Lenders' declaration of default and the potential imminent termination of their financing, the Debtors were fully justified in negotiating an amendment to the DIP Credit Agreement as they did.

As to the merits of the First Amendment, the Court believes that the Debtors exercised sound and reasonable business judgment there as well. The Debtors made three significant gains in the First Amendment. They obtained a waiver from the DIP Lenders of the declared default, which as just discussed was important insofar as the Debtors' relationships with customers and suppliers were concerned. They avoided a termination of their DIP financing, without which they could not have continued to operate. And they gained perhaps the most important commodity of all—time. They gained time to file their disclosure statement and plan, and they gained time in which to pay the DIP Lenders without an immediate threat of termination of their financing.

Did the Debtors pay too high a price for the concessions they received? Perhaps, but it is likely that only time will tell. The First Amendment contains stringent timelines for the marketing and sale of some of the Debtors' principal assets, but the Debtors' senior management had over a period of several months developed strategic plans for the marketing and sale of those assets, and the Debtors' officers believe that they can meet those deadlines. The Committees have correctly pointed out that the Debtors missed their very first deadline that related to the sale of the Fertilizer Assets; however, the Debtors had made sufficient progress to obtain a waiver of that deadline from the DIP Lenders and an agreement that the Debtors are now in compliance with that deadline. This occurrence provides the Court with some reassurance that the Debtors

can meet the timelines and that the DIP Lenders will be reasonable in extending those timelines when progress is being made and the circumstances support an extension. Similarly, the Debtors' senior officers believe that the Debtors can continue to operate their numerous businesses on the liquidity that is provided under the First Amendment, even though the available liquidity is being reduced by some $70 million. At the time of the hearing, the Debtors had already paid down more than $40 million of the debt as required in the First Amendment, and the officers expressed confidence that they would be able to meet other paydown requirements without a significant impact on their ability to operate on the reduced credit availability. Although the Committees questioned the decision to give up the $25 million line of credit under Tranche A, the Debtors' officers convincingly testified that Tranche A was no longer needed for the Debtors' operations and that maintaining Tranche A was an unnecessary expense of perhaps as much as $250,000 a year, not an insignificant amount of money. A major area of concern was whether the Debtors would have sufficient liquidity to get through the spring fertilizer season, but with the sale of a majority of the Fertilizer Assets, those concerns should be largely alleviated.

Finally, the evidence showed that the Debtors' senior management engaged in extensive study, research, projections and analyses in determining their bargaining positions in the negotiations on the First Amendment and whether they would be able to comply with all of its requirements. The Committees, through their expert witnesses, challenged the accuracy of the Debtors' forecasts and projections, but they did not show that those forecasts and projections were fatally flawed. More than anything, they disagreed with the results and the conclusions drawn from

them. The fact that the Committees and their experts disagree with the decisions made does not mean that those decisions were unsound or unreasonable. "A reasonable business judgment, based at the time on adequate information, becomes no less reasonable merely by contrary insights gained through hindsight." *Stetler v. Fosha*, 809 F.Supp. 1409, 1424 (D.Kan. 1992), citing *U.S. Fidelity & Guaranty Co. v. Canale*, 257 F.2d, 138, 140 (6th Cir. 1958). The Courts should permit debtors to exercise their reasonable judgment "so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest." *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y.1990). In Terry's words, the First Amendment was "the most prudent step we could take." The Court cannot disagree with that decision, nor should the Court substitute its judgment for the judgment of the Debtors when that judgment has been reasonably and properly exercised.

**2. The amended DIP financing is in the best interests of the estate and its creditors**

The Committees have argued that the allegedly onerous and one-sided provisions of the First Amendment are not in the best interests of the Debtors and the Committees' constituencies. They point to the stringent timelines imposed on the Debtors for the marketing and sale of assets and assert that these more concrete milestones will make it more likely that the DIP Lenders will find the Debtors in default if they fail to meet a particular milestone. They insist that the reductions in liquidity will unreasonably restrict the Debtors' ability to finance their ongoing operations and may result in a default.

Contrary to these arguments, the Court believes that the First Amendment—despite the tough new guidelines for the marketing and sale of major assets—is in the best interests of the estate and the creditors. Much of what the Court has already said in the immediately preceding discussion applies here as well and need not be repeated. It was in the best interests of the Debtors, and thus their creditors, to avoid a termination of the Debtors' DIP financing; everyone has agreed that a termination of financing by the DIP Lenders would have been disastrous for the Debtors. The Court is convinced that a termination of the Debtors' funding in December or January would, more than likely, have caused the Debtors to cease their business operations, to the extreme detriment of their creditors, especially the unsecured creditors and bondholders. It was also in the best interests of the Debtors to avoid a public declaration of default on the DIP financing and to avoid a public fight over whether they had or had not defaulted on the requirements of the DIP Credit Agreement. As previously noted, such public events would have had serious repercussions with the Debtors' customers and suppliers.

It appears to the Court that the Debtors have reached a point in these bankruptcy proceedings where a substantial reduction in liquidity will not be harmful to the Debtors' business operations. This is especially true in light of the fact that the Debtors are now on the verge of completing the sale of their Fertilizer Assets to Koch Nitrogen Company for a total sale price of approximately $293 million, thereby resulting in a very substantial reduction in the debt owed to the DIP Lenders. The Debtors' officers are convinced that they will have sufficient liquidity to continue their operations. It is unquestionably in the best interests of the Debtors and the unsecured creditors that the Debtors

continue their operations and pay the debts owed to the DIP Lenders; a liquidation of the Debtors' assets in a Chapter 7 proceeding would likely produce very little for the unsecured creditors, whereas it appears that a successful reorganization could produce significant dividends for the unsecured creditors.

Equally important is the fact that the Debtors gained additional time in which to file their plan of reorganization and their disclosure statement. In other words, they gained valuable time in which to reorganize their businesses. The requirement in the original DIP Credit Agreement requiring the filing of a DIP Lender-approved plan of reorganization within 180 days was unreasonable, virtually all parties have agreed. Assuming they are able to meet the guidelines for the marketing and sale of assets, the Debtors will have gained weeks, if not months, in which to put together a viable plan of reorganization that will be more likely to garner the support of the remaining creditors.

For all of these reasons, the amended financing is in the best interests of the estate and the creditors.

### 3. The credit transaction is necessary to preserve the assets of the estate, and is necessary, essential, and appropriate for the continued operation of the Debtors' businesses

As is apparent from the discussion hereinabove, the Court is convinced that the First Amendment is necessary to preserve the assets of the estate and is necessary, essential, and appropriate for the continued operation of the Debtors' businesses. A termination of the post-petition financing would have likely been fatal to the Debtors. The First Amendment avoids the termination of the DIP financing and gives the Debtors sufficient time to market and sell several of their major assets so as to pay down the debt to the DIP Lenders and then reorganize around their remaining core assets. Without the continued financing, the Debtors would likely be forced into a Chapter 7 or 11 liquidation, to the detriment of all creditors other than the DIP Lenders.

### 4. The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender

The Committees have strenuously contended that the terms of the First Amendment are heavily one-sided in favor of the DIP Lenders and are basically unfair to the Debtors. The Committees argue that the timelines for the marketing and sale of assets are too stringent and will lead to default down the road, and that the reductions in liquidity will make it more likely that the Debtors will be unable to operate their businesses properly. The Committees contend that the First Amendment is not fair or reasonable because the DIP Lenders are substantially oversecured, and therefore the concessions made by the Debtors were unnecessary and unwarranted. The Committees also assert that the $691,000 fee payable to Deutsche Bank was unwarranted, as were the releases which the Debtors gave the DIP Lenders for any claims or causes of action the Debtors might have against the DIP Lenders.

■ Let there be no doubt—the DIP Lenders drove a hard bargain. On cross examination by Committee counsel, Terry, the Debtors' CEO, conceded that most of the provisions in the First Amendment favored the DIP Lenders. However, hard bargains are often the lot of Chapter 11 debtors. Chapter 11 post-petition financing is "fraught with dangers for creditors," and debtors may have to enter into hard bargains to acquire (or continue to receive)

the funds needed for reorganization. *See In re Ellingsen MacLean Oil Co., Inc.,* 65 B.R. 358, 365 (W.D.Mich.1986). In the *Western Pacific* case, the court approved the debtor's borrowing $30 million on a superpriority basis even though the court found the terms of the loan to be onerous, costly, and tough. *Western Pacific,* 223 B.R. at 572. It is not impermissible for a bank to use its superior bargaining power to obtain creditor-favorable terms in a financing agreement. *See In re Burr,* 160 F.3d 843, 848 (1st Cir.1998); *In re Briggs,* 143 B.R. 438, 454 (Bankr.E.D.Mich.1992).

Viewed in isolation, several of the terms of the First Amendment might appear to be extreme or even unreasonable. Certainly, many of them favor the DIP Lenders. But, taken in context, and considering the relative circumstances of the parties, the Court does not believe that the terms are unreasonable.

First, the timelines for the marketing and sale of assets that were included as part of the First Amendment had been under discussion, if not negotiation, between the Debtors and the Lenders for much of 2002. In April or May 2002, the Board of Directors of Farmland had adopted a "sense of the board" resolution stating that the Debtors would sell up to $500 million of assets to pay off the debt to the banks. Deutsche Bank's loan officer had had numerous discussions with the Debtors concerning the plan to sell assets, and believed that the Debtors had committed to sell many of their major assets— including the Protein Assets if necessary— to pay off the bank debt. When Terry became Farmland's CEO in May 2002, he appeared to back off of any such commitment for a time, but he and other senior management engaged a financial advisor and eventually developed a strategic plan for the sale of major assets. The strategic plan, according to the testimony, contained

deadlines for the sale of assets that were *less stringent* than the guidelines contained in the First Amendment. It was not unreasonable for the DIP Lenders to insist on having a definite timetable for the sale of assets, considering the Debtors' equivocation on that point for the preceding several months. And, since the milestones contained in the First Amendment were less stringent than timelines that had previously been proposed by the Debtors themselves, it is difficult to conclude that the timelines are unreasonable. Although the Debtors did not meet the first milestone regarding the sale of the Fertilizer Assets, the DIP Lenders showed reasonableness and flexibility in extending that deadline in light of the progress that was shown toward that goal. This leads the Court to believe that the DIP Lenders will continue to be flexible and reasonable in their "enforcement" of the milestones; if they are not, Court intervention might become necessary.

Second, the reductions in liquidity are appropriate at this stage of the Chapter 11 proceedings. With the sale of the Fertilizer Assets, the Debtors' debt to the banks will be reduced to well under $100 million. As assets are sold, the Debtors' requirements for financing are being reduced. The sale of the Fertilizer Assets, in particular, will substantially reduce the Debtors' need for more liquidity, particularly in the spring season. In the event fertilizer sales again become a drag on the Debtors before the sale is closed, as they have in recent years, the Debtors have developed contingency plans to close plants and at least reduce the bleeding. The Debtors have been engaged in a program to reduce overhead and operating costs, and those costs will be further reduced by the sale of other assets and businesses. Though the Committees' experts were critical of the Debtors for giving up the Tranche A credit facility, both Rhodes and Vance testified

that Tranche A was no longer necessary for the Debtors' operations and that maintaining it was a waste of money. Further, the Committees expressed concern that the Debtors could meet the paydown deadlines set by the First Amendment, but the evidence showed that the Debtors had already met the first and largest debt reduction of $40 million before the February 28 deadline. If these reductions in liquidity had been required at an earlier stage in the case, the Court would have had grave doubts in approving them. However, at this stage of the proceedings, the reductions are not unwarranted, and in fact should be expected given the Debtors' ongoing sales of assets.

Third, as for the DIP Lenders' secured position, there is virtually no doubt that the DIP Lenders are substantially oversecured, but that does not mean that they are not entitled to the protections contained in the First Amendment. The testimony indicated that the DIP Lenders could be oversecured by as much as $500 million or more, depending on the values ascribed to the Debtors' assets and the amount of debt remaining to be paid.[15] The Committees' arguments seem to suggest that, because the DIP Lenders are so far oversecured, they are not entitled to insist on a specific plan for the sale of assets, to insist on deadlines or timelines for the sale of assets, or to insist that their very substantial loans be paid down on a tightly circumscribed schedule. Given the history of dealings between the Debtors and the DIP Lenders with respect to selling assets and paying down the bank debt, the lack of progress that had been made by the Debtors in selling major assets, and the fact that the Debtors are in a Chapter 11 bankruptcy proceeding, it was not un-

fair or unreasonable for the DIP Lenders to insist on the protections in the First Amendment, regardless of how much oversecured they were. The DIP Credit Agreement required the Debtors to submit to the DIP Lenders in July 2002 a proposed asset sale program concerning the sale of non-core assets; it appears that this task was not timely accomplished and may not have been accomplished at all. Based on past history, the DIP Lenders had at least some basis for believing that the Debtors were dragging their feet, at best, or avoiding the sale of their principal assets, at worst. Therefore, the DIP Lenders were not out of place in demanding that the Debtors, at long last, put their commitments to sell assets on a definite schedule in the First Amendment, particularly since the Debtors had failed to do that anywhere else, despite their promises to do so.

Fourth, the Committees are right to criticize the $691,000 fee to the Lenders' Agent, Deutsche Bank. The fee is substantial. The Debtors' officers testified that they tried to avoid the inclusion and payment of that fee, but they were unsuccessful. The Debtors had paid fees of a somewhat similar size in establishing the credit facility in February 2002 and in entering into the DIP Credit Agreement in June 2002. However, considering the amount of the post-petition financing involved (over $300 million), the amount of time spent in negotiating the First Amendment, and the fact that the time spent on these matters detracted the banks from pursuing other, perhaps more profitable business, the amount of the fee is not unreasonable.

In this connection, it should also be observed that the total cost of the First Amendment to the Debtors appears to be

**15.** Because Deutsche Bank refused to turn over its in-house appraisals of the Debtors' assets during discovery, the Court essentially prevented the DIP Lenders from challenging the fact that they were oversecured.

less than $1.5 million, which is certainly reasonable given the amount of the Debtors' bank debt. The Debtors will have incurred about $500,000 in extra interest as a result of the DIP Lenders' imposition of the default interest rate on December 9, and they will be required to pay the $691,000 fee to Deutsche Bank. By entering the Interim Order on March 3, 2003, and directing the DIP Lenders to stop charging interest at the default rate, the Court has limited the costs to the Debtors somewhat. In any event, the cost of the amendment is reasonable under the circumstances, and is much more reasonable than many such fees that the Court sees in other cases and instances.

Fifth, the Committee is also right to criticize the releases that the Debtors were required to give as a condition of entering into the First Amendment. However, such releases are a common price to pay for post-petition financing in Chapter 11 cases; many lenders are unwilling to extend credit in a bankruptcy situation without removing the risk of later being sued for either real or imagined injuries that occurred before the loans were made. Moreover, there has been no evidentiary showing of illegal actions taken by the DIP Lenders. The two Committees have been in place now for almost a year and have been extremely active and involved in this case. They have had ample opportunity to investigate any irregularities and the Court is certain the Committees and their very competent counsel would have discovered any illegalities or improprieties. Since the Committees are not parties to the agreement, the release contained in the First Amendment arguably would not prohibit the Committees from pursuing ac-

tions against the DIP Lenders if they believe such actions are warranted.[16]

As the Debtors have observed in their suggestions in support of the Motion, the courts have consistently held that in order to offset the apparent risks of lending money to an entity in bankruptcy, a debtor must offer incentives to post-petition lenders. *See, e.g., Ellingsen MacLean Oil Co.,* 65 B.R. at 365 (Chapter 11 post-petition financing is "fraught with dangers for creditors . . ."). Accordingly, courts recognize that a debtor may need to "enter into a hard bargain with a creditor in order to acquire the needed funds to complete reorganization." *Id.* at 365. These rules apply in this case. While the DIP Lenders appear to be well secured here, they have a great deal at stake and could be expected to drive a hard bargain.

It should be noted that, at this point, there has been no showing that the First Amendment has harmed the unsecured creditors or taken something away from them. The DIP Lenders are not receiving any property or proceeds that they are not entitled to receive under their loan documents. The Debtors have not granted new or additional security interests in property that would otherwise be held for the benefit of the unsecured creditors. In many instances, the unsecured creditors lose something of value when a Chapter 11 debtor enters into a post-petition financing agreement. *See In re FCX, Inc.,* 54 B.R. 833, 838 (Bankr.E.D.N.C.1985) ("Frequently, the result is a postpetition financing agreement calling for substantial concessions from the debtor, often at the expense of the rights of unsecured creditors."). That does not appear to be the case here.

Finally, there is nothing in the First Amendment to prohibit the Debtors from

---

16. The Court realizes that this point almost certainly is debatable or would be debated, but that question is best left for another day.

refinancing the remaining debt and thereby escape the deadlines and other loan provisions that the Committees consider so onerous. If anything, the substantial reductions that are being made in the bank debt would seem to make it more likely that the Debtors would be able to obtain takeout financing from another source. If the requirements imposed by the First Amendment are so draconian, then the Debtors *should* be seeking other financing.

In short, while the terms of the First Amendment are tough, when considered in the context of the Debtors' circumstances they are not unconscionable, oppressive, or punitive. *Western Pacific,* 223 B.R. at 572. Moreover, the Committees overlook the benefits gained by the Debtors in the First Amendment, as detailed previously— a waiver of the declaration of default so that it did not have to be publicly reported; avoidance of termination of the Debtors' DIP financing, which would most likely have been fatal to the company; and additional time in which to negotiate and then file a disclosure statement and fully developed plan without the threat of imminent termination of financing.

**5. The financing agreement was negotiated in good faith and at arm's length between the Debtors, on the one hand, and the Agents and the Lenders, on the other hand**

By far the most serious accusations made by the Committees—and the ones on which they expended the most energy at the hearing—were that the DIP Lenders had unreasonably withheld their approval of the Debtors' proposed plan of reorganization in the days leading up to November 27, 2002, and that the DIP Lenders's declaration of an event of default on December 9, 2002, was merely a pretext to extract more favorable terms from the Debtors in the post-petition financing. These allegations raise questions as to whether, because of the declaration of a default and the threatened termination of funding, the negotiations were truly conducted at arm's length and in good faith by the DIP Lenders.

While the Committees pursued these issues with great vigor at the hearing and in the suggestions and briefs filed with the Court, at the end of the day the allegations were not supported with any measurable substantive evidence. They simply have not been proven.[17]

The Committees' allegations that the DIP Lenders were unreasonable in refusing to approve the Debtors' proposed plan of reorganization and acted in bad faith in that respect seem to revolve around two central themes: (1) That the DIP Lenders never gave the Debtors clear direction on what must be in any proposed plan so as to obtain the Lenders' approval, and (2) that the DIP Lenders had no justification for disapproving the Debtors' proposed plan of reorganization because it provided that the DIP Lenders would be paid in full on the effective date of the plan.

With respect to the first point, the Court has set out at considerable length hereinabove the evidence regarding the parties' discussions and negotiations for several months leading up to the execution of the First Amendment, and that evidence will

---

17. Even the Debtors alleged that the DIP Lenders' objections to the proposed plan of reorganization were in bad faith and motivated solely by a desire to extract additional concessions from the Debtors (namely, a commitment to sell the Beef Assets). These allegations are particularly interesting in light of the fact that the Debtors made a presentation to Deutsche Bank and the Committees on September 4, 2002, in which the Debtors specifically stated that their business strategy included a sale of all or a portion of the Debtors' interest in National Beef (Ex. E to Sun Declaration). Like the Committees' allegations, the Debtors' allegations were not proven.

not be repeated here. In brief, the evidence shows that the banks had been insisting for months that the Debtors put together a definitive plan for the marketing and sale of the assets required to be sold so that the banks could be paid in full. The evidence also indicates that the Debtors' management—despite directions from the Board of Directors to sell any and all assets necessary to pay the banks the $500 million they were owed—equivocated and dragged its feet in presenting such a plan to the banks. Through Deutsche Bank's loan officer and counsel, the DIP Lenders repeatedly indicated to the Debtors' management that the DIP Lenders expected the Debtors to begin selling the assets necessary to pay the banks, and that the banks were exasperated with the Debtors' lack of progress in this regard. It surely could not have come as any surprise to the Debtors that the DIP Lenders would insist that any proposed plan of reorganization set out a timetable for the sale of assets and payment of debt. That point was driven home by Deutsche Bank's counsel's letter to the Debtors' attorneys on December 9 (Debtors' Ex. 2, p. 3), quoted at length hereinabove. Moreover, the DIP Credit Agreement (§ 6.9) entered into in June 2002 required the Debtors to develop and submit to the banks no later than the entry of the DIP Financing Order (July 2, 2002) a detailed and specific "asset sale program" for conducting systematic asset sales. That provision required the Debtors to use their best efforts to take the actions outlined in the asset sale program, including consummation of the proposed sales. It seemed from the evidence that the Debtors had not complied with this requirement; if they had, then the Court can see no valid reason for not including the same asset sale program in the proposed plan of reorganization. If they had not complied with the requirement, the plan of reorganization would have been a good place to start compliance.

The fact that the Debtors were "uncomfortable" with the timelines demanded by the DIP Lenders and were "uncomfortable" with predicting in a plan of reorganization when they would be able to accomplish the sales of assets, as argued by the Bondholders Committee in their trial brief, does not mean that the DIP Lenders were unreasonable in rejecting a proposed plan that contained no deadlines for the sale of assets, nor does it suggest that the DIP Lenders were acting in bad faith. In short, what the banks wanted was a definitive plan for the payment of their notes, nothing more and nothing less. That had been made clear to the Debtors over the course of several months. Besides, such repayment provisions are the primary provisions in most all plans of reorganization. It is almost specious to suggest that the Debtors did not know what should be included in a plan in order to obtain the DIP Lenders' approval.

■ As for the assertion that the DIP Lenders unreasonably refused to approve the plan of reorganization that was proposed by the Debtors and acted in bad faith in doing so, the Court finds several valid and reasonable bases for the banks' refusal. As a basic principle, no creditor should be expected to approve a plan that simply states that the creditor's notes will be paid in full on the effective date, and nothing more. This is especially true when the creditor is, like the DIP Lenders here, owed more than $200 million and the Debtors have been promising for months to implement a strategic plan for the sale of assets to pay that debt but have failed to deliver on that promise. It seems only reasonable that a proposed plan would contain such detailed proposals. The Debtors have asserted that those kinds of details did not need to be in the plan—that the plan was to be only a blueprint for future action—but rather could be set out in the Debtors' disclosure statement. The difficulty with this argument is that the

Debtors did not file a disclosure statement with the plan of reorganization; rather, they sought and obtained an extension of time, since further extended, in which to file their disclosure statement. By not filing a disclosure statement with the proposed plan, the Debtors, of their own volition, failed to develop the details necessary to support their blueprints.[18] The Debtors have suggested in a footnote in their brief in support of the Motion that the DIP Credit Agreement did not require the filing a disclosure statement by November 27; it only required the filing of a plan. That argument is so specious that it merits no further comment. In summary, it seems to the Court that the Debtors invited rejection of the proposed plan by failing to file a disclosure statement at the same time.

The DIP Lenders were also justified in rejecting the Debtors' proposed plan because the plan was clearly not confirmable. The plan as filed was incomplete in several respects, as noted previously. Most dramatically, it did not contain any provisions for the payment of unsecured debt. The Debtors have admitted that the plan as filed was a "bare bones" plan, thereby essentially conceding that they knew the plan was incomplete and incapable of confirmation. It is difficult to condemn the DIP Lenders for refusing to approve a plan that is, on its face, not confirmable, even if it does state that they are to be paid in full. The Debtors, however, assert in their brief that the DIP Lenders could not have objected to confirmation of the plan filed by the Debtors because, as holders of unimpaired claims, the DIP Lenders would be "conclusively presumed to have accepted the plan." 11 U.S.C. § 1126(f). The Debtors are incorrect in this assumption. Even so-called unimpaired creditors should be allowed to

raise objections to a plan on the basis of good faith, feasibility, and other generalized confirmation requirements, as well as to contest the categorization as being unimpaired. 7 *Collier on Bankruptcy* ¶ 1129.02[3], 1129–21–22 (15th ed. Rev.).

Finally, the Court believes that the DIP Lenders were justified in rejecting the Debtors' plan because the Creditors Committee had also rejected the proposed plan. How can the major secured creditor be faulted for refusing to give its endorsement to a "bare bones" plan that has also been rejected by the major unsecured creditor constituency in the case? Merits of the plan aside, without the support of the Committee representing the unsecured creditors, who hold over $500 million of debt, the plan could never be confirmed. Arguing that the DIP Lenders were unreasonable or acted in bad faith in refusing to approve a plan that is unconfirmable on its face and does not have the support of the major unsecured creditor constituency borders on the frivolous.

Withholding consent to a plan or other document is reasonable if it is based on objective factors and is supported by substantial objective evidence. *In re Van Ness Auto Plaza, Inc.,* 120 B.R. 545, 546 (Bankr.N.D.Cal.1990). The term "unreasonable" conveys the same idea "as irrational, foolish, unwise, absurd, silly, preposterous, senseless, and stupid." *Id.,* at 548. In *Thurman v. Meridian Mutual Ins. Co.,* 345 S.W.2d 635, 639 (Ky.1961), the court held that "the determination of what is 'unreasonable' is one where, under the evidence presented, there is no room for difference of opinion among reasonable minds."

In this case, there is ample evidence to support a conclusion that the DIP Lenders did not act arbitrarily or capriciously or in bad faith in refusing to approve the Debt-

---

**18.** The Court is compelled to observe that a statement that a creditor "will be paid in full on the effective date" is not much of a blueprint.

ors' proposed plan of reorganization. To the contrary, the Court concludes that the DIP Lenders acted reasonably and in good faith in refusing to approve the Debtors' proposed "bare bones" plan of reorganization and in negotiating the First Amendment.

For all of the foregoing reasons, the Court finds that the Debtors' Motion for approval of the First Amendment to the DIP Credit Agreement should be finally approved.

Therefore, it is

**ORDERED** that the Debtors' Motion for Order Authorizing First Amendment to DIP Credit Agreement (Document # 2000) be and is hereby finally approved, and that all objections to the Motion are hereby overruled.